*In re: B.Cd. & B.Cb.*, No. 47, September Term, 2025. Opinion by Killough, J.

**FAMILY LAW – CINA – SAFE HAVEN ACT – NEGLECT**
The Supreme Court of Maryland held that a parent who surrenders a newborn pursuant to the Safe Haven Act may be found to have neglected that child within the meaning of the Child in Need of Assistance (CINA) statute where the surrendered newborn has no legal custodian and no provision for long-term care upon hospital discharge, thereby placing the child at a substantial risk of harm. Md. Code Ann., Cts. & Jud. Proc. §§ 3-801(t)(1) (2024), 5-641 (2024).

**FAMILY LAW – CINA – SAFE HAVEN ACT – CIVIL LIABILITY – IMMUNITY**
The Supreme Court of Maryland held that the Safe Haven Act's immunity from "civil liability" does not bar a CINA neglect finding, which is the non-punitive jurisdictional predicate that allows the juvenile court to adjudicate the child's case and grant the local department of social services the authority to make long-term arrangements for the child's needs. Md. Code Ann., Cts. & Jud. Proc. § 5-641(b)(1) (2024).

Circuit Court for Anne Arundel County
Case No.: C-02-JV-24-000463
Case No.: C-02-JV-24-000464
Argued: March 6, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 47

September Term, 2025

_____

IN RE: B.CD. & B.CB.

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Killough, J.
Watts and Eaves, JJ., concur and dissent.

_____

Filed: July 15, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The Maryland Safe Haven Act, codified at Courts and Judicial Proceedings Article ("CJP") § 5-641, (2020 Repl. Vol.), permits a parent to surrender an unharmed newborn at a designated facility within sixty days of birth, free from criminal prosecution or civil liability for the act of surrender. Within 24 hours after accepting the newborn, the hospital or other designated facility that accepts the newborn must notify the local department of social services. *Id.* at § 5-641(c) (2). Where a newborn is dropped off at a designated facility in accordance with the Safe Haven Act, that person "shall be immune from civil liability or criminal prosecution[.]" *Id.* at § 5-641 (b)(1). Under the regulations adopted to implement the Safe Haven Program, a local department of social services is required to file a "child in need of assistance" ("CINA") petition with the juvenile court. COMAR 07.02.27.03(E). The CINA statute provides the legal framework through which the State cares for, protects, and finds a permanent home for a surrendered newborn. CJP § 3-801 (2024). In order for a juvenile court to adjudicate a child who was abandoned at a designated facility under the Safe Haven Act to be a CINA, the court must make a finding of "neglect," that is, the child has been "placed at substantial risk of harm." *Id.* at § 3-801(f)(1), (t)(1).

Petitioner A.C. ("Mother") surrendered her four-day-old twin sons, B.Cd. and B.Cb., at Baltimore Washington Medical Center ("BWMC"), pursuant to the Safe Haven Act on September 16, 2024. The Anne Arundel County Department of Social Services (the "Department") took custody and filed CINA petitions. Mother was subsequently identified and participated fully in the proceedings. At the de novo adjudicatory and disposition hearing, she contested the neglect finding on statutory interpretation grounds. She also invoked CJP § 3-819(e) and requested that custody be awarded to Father. The

juvenile court found that Mother's actions constituted neglect, denied her CJP § 3-819(e) motion to award custody to Father, and committed the children to the Department's custody.

Mother timely appealed the circuit court's CINA finding to the Appellate Court of Maryland, which affirmed in a reported decision. *In re B.Cd.*, 267 Md. App. 61 (2025). While the appeal was pending, the CINA case closed, and Father was awarded full custody.[1] We granted certiorari to address the following questions, *In re: B.Cd & B.Cb.*, 492 Md. 646 (2025):

1. Does a parent neglect their child—i.e., place them at "substantial risk of harm"— when they act in line with Maryland's Safe Haven Program?

2. Is a CINA neglect finding a "civil liability" against which the Safe Haven Program provides a shield?

For the reasons stated below, we affirm the judgment of the Appellate Court of Maryland.

## I.

### Factual and Procedural Background

#### A. The Surrender and Initial CINA Proceedings

Twins boys, B.Cd. and B.Cb. (the "Twins"), were born on September 12, 2024, at the University of Maryland Medical Center. Mother, a twenty-three-year-old woman who

---

[1] Although the CINA case underlying this appeal closed on April 7, 2025, the CINA framework does not merely protect the child. It protects the parent as well. Parents have a fundamental constitutional right to the care and custody of their children. Therefore, we conclude that the appeal is not moot. The potential for collateral consequences of the neglect finding preserve a live controversy sufficient to maintain justiciability. *See In re Kaela C.*, 394 Md. 432, 453 (2006) (citation omitted) ("Where . . . it seems apparent that a party may suffer collateral consequences from a trial court's judgment, the case is not moot."). We therefore proceed to the merits.

2

was raising two other children, brought the Twins to BWMC on September 16, 2024—four days after their birth. She dressed each child in a onesie, taped a note with each child's name to him, and told hospital staff the Twins' ages and information about their birth. She did not disclose her identity, did not provide information about other potential caregivers, and did not express an intent to return. She specifically told staff she was invoking the Safe Haven Act and wanted the Twins placed out of her care. Hospital staff evaluated the children and found them "healthy" with "no medical concerns."

BWMC notified the Department on September 16, 2024. The following day, the Department took the Twins into emergency shelter care and placed them in an approved foster home. On September 18, the Department filed a CINA petition for each Twin in the Circuit Court for Anne Arundel County, sitting as the juvenile court, requesting continued shelter care. A magistrate held a shelter care hearing that same day, recommended that the court authorize the Department to assume temporary custody, and the court so ordered. *See* Md. Rule 11-103(a)(1), (3).

On September 19, 2024—two days after the surrender—the Department received a call from the Twins' maternal grandmother, who identified Mother. Mother spoke with the Department on that call, explaining that she had surrendered the Twins due to concerns about domestic violence from the children's father. The Department also learned Father's identity in part because, in late September 2024, Father had filed a custody action in circuit court seeking custody of the Twins. That action, however, could not establish Father's parental rights until paternity was confirmed through DNA testing and adjudicated on the merits. That process required service of process, a DNA confirmation hearing, and a merits hearing—none of which could have produced emergency relief for these newborns. On

3

October 9, 2024, the Department contacted Mother to ask whether she was willing to complete maternity testing, and she agreed to do so. During the same conversation, she indicated her desire to reunify with her children. The Department amended the CINA petitions to reflect the putative parents' identities, noting that DNA testing was pending.

A magistrate held an adjudicatory hearing on October 18, 2024. Because DNA results had not yet returned, Mother and Father were not yet parties. The magistrate recommended sustaining the adjudicatory facts and, after the Department's unopposed motion, deferred disposition pending the DNA results. In early November 2024, genetic testing confirmed that Mother and Father were the biological parents of B.Cd. and B.Cb. At the disposition hearing on November 15, 2024, the magistrate recommended the Twins be declared CINA and, due to concerns about Mother's decision to surrender the children as well as Father's criminal history and the domestic violence allegations against him, recommended commitment to the Department's custody instead of either parent. Both parents filed exceptions and invoked their rights to a de novo hearing. Md. Rule 11-103(e).

### B. The De Novo Hearing and Disposition

On January 14, 2025, the circuit court held a de novo adjudicatory and disposition hearing. The Department called the two caseworkers on the Twins' case as witnesses. The Department introduced the Twins' birth certificates and DNA results establishing parentage.

Mother argued that her actions did not satisfy the statutory definition of neglect and that, in any event, the Safe Haven Act's immunity from civil liability precluded a neglect finding. She introduced no evidence. She litigated the case entirely on the legal question of statutory interpretation.

4

The juvenile court rejected Mother's arguments. It found that Mother's actions constituted neglect, stating:

> I think the mere leaving the children even in a safe place . . . is neglectful . . . I think when you leave a child with that little information, especially a four day old child, that is placing a child in substantial risk because how does the one receiving the child know . . . anything about the child[.]

The court further determined that an interpretation of the Safe Haven Act that would prevent a CINA proceeding would lead to an illogical result, because it would bar a neglect finding even in cases where the parents were never identified.

At disposition, Mother invoked CJP § 3-819(e) and requested that custody be awarded to Father rather than the Department, acknowledging that "today is not the day that the children should be coming to her." Subsection (e) permits the court to award custody to the other parent in lieu of declaring a child a CINA. On January 16, 2025, the juvenile court denied Mother's § 3-819(e) motion, found the Twins to be CINA and committed them to the Department's custody. Both parents appealed. On April 7, 2025, while the appeal was pending, the CINA cases were terminated with Father obtaining full custody.

### C. The Appellate Court

The Appellate Court affirmed the circuit court in a reported opinion. *In re B.Cd.*, 267 Md. App. at 61. On the question of whether the conduct of a person who follows the Safe Haven Program can support a finding of "neglect" under the CINA statute, the court noted that "Maryland law is clear that 'a finding of neglect may be based on a substantial risk of harm to the child if the [Department of Social Services] does not take charge of the child.'" *Id.* at 88 (alteration in original) (quoting *Doe v. Allegany Cnty. Dep't of Soc.*

5

*Servs.*, 205 Md. App. 47, 60 (2012)).  The court explained that under the reasoning in *Doe*, a finding of statutory neglect may focus "on the impact the actions of [the parents] could have had on [the child] had the local department not taken charge of [the child]."  *Id.* (alternations in original) (quoting *Doe*, 205 Md. App. at 60).

Applying this reasoning, the court concluded that Mother neglected the Twins not at the moment of surrender but when she "failed and refused to make herself available to render proper care and attention" upon their discharge.  *Id.* at 93 n.6.  Turning to Mother's assertion that a statutory finding of "neglect" under CINA is at odds with the immunity from "civil liability" provided under the Safe Haven Act, the Appellate Court determined that the term "civil liability" was ambiguous.  *Id.* at 95-96.  The court examined the legislative history, as well as the regulatory framework that had been in place for over twenty years.  *Id.* at 97-98.  The court concluded that Mother's interpretation of the Safe Haven Act would lead to an absurd result, because the CINA framework is the only mechanism by which the Department can legally intervene to care for abandoned children. *Id.* at 96-100.

## II.

### Standard of Review

This Court reviews CINA determinations under three interrelated standards: factual findings are reviewed for clear error; questions of law are reviewed de novo; and mixed questions of law and fact, if based on correct legal principles and factual findings that are not clearly erroneous, are reviewed for abuse of discretion.  *In re T.K.*, 480 Md. 122, 143 (2022).

6

Both questions presented are pure questions of statutory construction, which are reviewed de novo. *Ledford v. Jenway Contracting, Inc.*, 490 Md. 666, 680 (2025). Because Mother introduced no evidence and contested only a legal question, there are no factual findings to review for clear error; the underlying facts were uncontested.

## III.

## Discussion

### A. Legal Framework

#### 1. CINA Statute

The CINA statute provides the legal framework through which the State protects children who lack adequate care. *See* CJP § 3-802(a)(1), (3); *In re M.Z.*, 490 Md. 140, 143–44 (2025). The statute's purposes include "[t]o provide for the care, protection, safety, and mental and physical development of any child coming within" its provisions and "[t]o conserve and strengthen the child's family ties and to separate a child from the child's parents only when necessary for the child's welfare." CJP § 3-802(a)(1), (3). A child qualifies as a CINA when court intervention is required because (1) the child has been abused, neglected, has a developmental disability, or has a mental disorder, and (2) the child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs. CJP § 3-801(f)(1), (2). "Neglect" means:

> the leaving of a child unattended or other failure to give proper care and attention to a child by any parent or individual who has permanent or temporary care or custody or responsibility for supervision of the child under circumstances that indicate: (i) That the child's health or welfare is harmed or placed at substantial risk of harm; or (ii) That the child has suffered mental injury or been placed at substantial risk of mental injury.

7

CJP § 3-801(t)(1).[2]

A CINA case proceeds in two phases. At the adjudicatory hearing, the Department must prove by a preponderance that the child falls within one of the enumerated categories of CJP § 3-801(f)(1). At the subsequent disposition hearing, the court determines whether court intervention is required and, if so, the appropriate placement. *See In re T.K.*, 480 Md. at 134-35. If the allegations are not sustained, the court must dismiss the petition. CJP § 3-819(b)(1)(i). If the allegations are sustained against only one parent and the other is able and willing to care for the child, the court may award custody to that parent before dismissing without a CINA finding. CJP § 3-819(e).

### 2. Safe Haven Act

The Maryland General Assembly enacted the Maryland Safe Haven Act in 2002. Md. Laws, Ch. 441 (codified as amended at CJP § 5-641). The Safe Haven Act provides in relevant part:

> (b)(1) A person who leaves an unharmed newborn with a responsible adult or at a designated facility within 60 days after the birth of the newborn, as determined within a reasonable degree of medical certainty, and does not express an intent to return for the newborn shall be immune from civil liability or criminal prosecution for the act.
>
> (2) If the person leaving a newborn under this subsection is not the mother of the newborn, the person must have the approval of the mother to do so.
>
> *             *             *             *
>
> (d) A responsible adult and a designated facility that accepts a newborn under this section and an employee or agent of the facility shall be immune from

---

[2] The General Assembly amended CJP § 3-801 to redesignate, without change, CJP § 3-801(s) as CJP § 3-801(t), effective October 1, 2024. Although Mother placed the Twins in the Safe Haven Program before October 1, 2024, we refer to the current subsection for clarity.

civil liability or criminal prosecution for good faith actions taken related to the acceptance of or medical treatment or care of the newborn unless injury to the newborn was caused by gross negligence or willful or wanton misconduct.

*      *      *      *

(f) The Secretary of Human Services shall adopt regulations to implement the provisions of this section.

CJP § 5-641.

Pursuant to subsection (f), the Secretary promulgated implementing regulations in 2003 at COMAR 07.02.27.01-.03. The Department's regulations describe the program's purpose as providing a mother "the opportunity to provide a safe abandonment of her newborn." COMAR 07.02.27.01(A). Relevant provisions of COMAR 07.02.27.03 provide as follows:

> C. The hospital or other designated facility that accepts a newborn shall notify the LDSS [local department of social services] within 24 hours after accepting the newborn.
>
> D. The LDSS in the jurisdiction where the hospital is located shall take responsibility of the newborn when medically ready for discharge under an OSC [Order of Shelter Care].
>
> E. A CINA petition shall be filed by the LDSS on behalf of the abandoned newborn in the jurisdiction where the hospital is located in conjunction with the request for an OSC.
>
> F. A Child Protective Services investigation shall be initiated if the mother, father, or relative of the newborn comes forth to identify the newborn and requests that the newborn be placed in the individual's care.
>
> G. *The child shall remain in the care of the LDSS under an OSC with a CINA finding and commitment to the LDSS pending the outcome of the investigation.*

COMAR 07.02.27.03(C)–(G) (emphasis added).

9

With the applicable statutory framework in mind, we turn to the parties' arguments.

### B. Parties' Contentions

Mother asserts that by "leav[ing] [] unharmed newborn[s] with a responsible adult or at a designated facility" in accordance with Subsection 5-641(b)(1) of the Safe Haven Act, she did not place the Twins "at substantial risk of harm" and thus, did not neglect them. According to Mother, a parent does not neglect—*i.e.,* does not place a child at substantial risk of harm—by placing them unharmed with a responsible adult or at a designated facility. According to Mother, she acted precisely within the instructions given by the Safe Haven Program, which was created by the Safe Haven Act, and her care plan did not pose any risk—much less a "substantial risk"—to the Twins' well-being under the CINA statute.

For its part, the Department points out that it can take custody of a child only if the juvenile court finds the child to be a CINA, and the court cannot make that finding unless it determines that "[t]he child has been abused, has been neglected, has a developmental disability, or has a mental disorder." CJP § 3-801(f)(1). The Department further explains that, because the newborn must be unharmed when left with a responsible adult or at a designated facility, the court cannot make a finding of "abuse" when the Safe Haven Act is followed. Thus, the Department, reasons, absent evidence that the newborn has a "developmental disability" or a "mental disorder," a juvenile court could only find a newborn, left pursuant to the Safe Haven Act, to be a CINA on the basis that the newborn has been "neglected."

Citing *Doe,* 205 Md. App. at 47, the Department argues that Maryland precedent establishes that, as a matter of law, a parent or other caregiver who abandons an otherwise

10

helpless but unharmed child to the custody of the local department of social services has neglected the child. The Department argues that abandonment of newborns under the Safe Haven Act constitutes "neglect," because absent the Department's intervention, the Twins would have been left completely helpless. Therefore, the Department asserts, Mother's actions placed the Twins at substantial risk of harm and the juvenile court correctly found that the Twins had been neglected.

Mother also argues that a finding of neglect in a CINA case would violate the Safe Haven Act's immunity "from civil liability." Mother cites to the definition of "liability" from Black's Law Dictionary as "the quality, state, or condition of being legally obligated or accountable." Liability, BLACK'S LAW DICTIONARY (12th ed. 2024). According to Mother, a CINA neglect finding is a finding that the parent has failed in their obligation of providing appropriate care and attention to a child and is thus encompassed within the definition of "civil liability."

In support of her statutory argument, Mother points to direct and collateral consequences that can flow from a CINA finding. Direct consequences of a CINA action can include the loss of custody of a child, and an order to pay support. According to Mother, collateral consequences of a CINA finding include (1) the inclusion of the parent on the state's child abuse registry under Family Law Article ("FL") § 5-714 (2017), (2) the adverse impact on an individual's qualification to become a foster parent, (3) the ability of a parent to maintain a parental relationship with other children, and (4) the shifting of the burden of proof to a parent at hearings regarding visitation with or custody of other children under FL § 9-101.

11

Mother also asserts that a neglect finding under CINA would be contrary to the legislative intent of the Safe Haven Act. Mother directs us to the purpose of the Act, which "is to provide the mother of a newborn the opportunity to provide a safe abandonment of her newborn by . . . [p]roviding immunity from civil liability and criminal prosecution for a mother who leaves an unharmed newborn with a responsible adult under certain circumstances[.]" Mother argues that, by subjecting a parent to a judicial finding of neglect in a CINA proceeding, such a statutory interpretation creates a disincentive for a party to rely upon the Safe Haven Act in direct contravention of the plain language and intent of the statute.

Finally, Mother argues that precluding a CINA neglect finding in a case arising under the Safe Haven Act will not "prevent a CINA case," as suggested by the juvenile court. According to Mother, the Department can properly take custody of the child under CJP § 3-815(a), which authorizes shelter care. Then, Mother asserts, the Department can proceed in one of three ways: (1) if the parents are unknown, the Department can proceed to file a petition for guardianship under FL § 5-313, which can lead to adoption; (2) if the parents consent, the Department can file for guardianship under FL § 5-320(a)(1)(iii)(1); or (3) if one or both parents desire custody, the child can be returned as the Department has no legal basis for holding the child.

In response, the Department argues that a CINA finding of neglect does not impose "civil liability" on the parent. The Department relies on the definition of "liability" in Black's Law Dictionary as "[t]he quality, state, or condition of being legally obligated or accountable . . ., enforceable by civil remedy or criminal punishment." *In re B.Cd.*, 267 Md. App. at 94. According to the Department, Mother has made no showing that the

12

neglect finding by the juvenile court imposed any specific legal responsibility on her enforceable by any civil or criminal remedy. The Department points out that a CINA finding requires a finding of *both* past abuse or neglect and a present inability or unwillingness of both parents to provide proper care. In addition, the Department argues that a CINA neglect finding cannot be affected by what Mother has identified as "collateral consequences," because Mother has not adduced any evidence that she has suffered or will suffer any such consequence.

With respect to legislative intent, the Department argues that the "narrow" purpose of the Safe Haven Act was to "'prevent newborn deaths' that result when parents abandon newborn infants in public places." The Department contends that to effectuate such purpose, the Act provides for (1) immunity from criminal prosecution for desertion of a child or for causing a child to become a CINA, and (2) immunity from civil liability for the "act" of leaving an unharmed newborn without an expressed intention to return, an act which would not otherwise be protected by the common-law doctrine of parent-child immunity.

Finally, the Department argues that Mother's interpretation of "civil liability" would lead to an absurd result by rendering the local department and juvenile courts powerless to protect a newborn in a CINA proceeding. The Department points out that a CINA petition for an unharmed newborn cannot proceed unless the child is found to be neglected, and that a guardianship petition under FL § 5-313 suggested by Mother cannot be pursued absent a judicial finding that the newborn was a CINA. The Department argues that the General Assembly did not vest authority in the hospital or another designated facility to

13

assume custody of the child and did not provide a mechanism separate from the CINA proceeding for the local department to assume custody.

## C. *Statutory Construction*

As noted above, the issues in this case present questions of law that we consider without deference to the decisions of the juvenile court or the Appellate Court. To answer Mother's questions, we must examine the meaning of the word "neglect" in the context of the CINA statute, CJP § 3-801(f)(1), as well as the meaning of the phrase "immune from liability" under the Safe Haven Act, CJP § 5-641.

"As in any question of statutory interpretation, the goal is to discern and implement the intent of the Legislature." *In re O.P.*, 470 Md. 225, 255 (2020). We begin, as we must, with the plain text of the statute, giving it its natural and ordinary meaning. *McClanahan v. Washington Cnty. Dep't of Soc. Servs.*, 445 Md. 691, 701 (2015). We review "the text of the particular provision within the context of the statutory scheme of which it is part." *In re O.P.*, 470 Md. at 255. When considering the context of the language, we may look to related statutes, earlier and subsequent enactments, and other materials that bear on legislative purpose. *Williams v. State*, 492 Md. 295, 307 (2025). "Review of the legislative history, as well as prior caselaw concerning the provision or similar provisions, may provide guidance and help confirm conclusions drawn from the text or resolve its ambiguities." *In re T.K.*, 480 Md. at 145 (citation modified).

> Where the words of a statute are ambiguous on their face, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process.

14

*Williams*, 492 Md. at 307–08 (citation modified). "In resolving ambiguities, [we] consider[] the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions." *Bennett v. Harford County*, 485 Md. 461, 486 (2023) (citations omitted). "In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Williams*, 492 Md. at 308.

Finally, where the General Assembly directs an administrative agency to promulgate regulations to implement a statute, we may give deference to the agency's interpretation of the statute as carried out by the regulations, particularly where the interpretation has been consistently applied for a long period of time. *Comptroller of Md. v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 362 (2022); *Smith v. Higinbothom*, 187 Md. 115, 132-33 (1946) (explaining that "where the language of a statute is susceptible of two constructions, a long-continued and unvarying construction applied by administrative officials is strong persuasive influence in determining the judicial construction of the statute").

### D. A Parent's Action in Delivering a Newborn to a Designated Facility Under the Safe Haven Act May Support a Finding of "Neglect" Under the CINA Statute

As we previously noted, "neglect" is defined under the CINA statute as the "failure to give proper care and attention to a child by any parent . . . under circumstances that indicate . . . [t]hat the child's health or welfare is . . . placed at substantial risk of harm[.]" CJP § 3-801(t)(1)(i). Mother argues that she could not have neglected the Twins, because she left them "unharmed" within 60 days of their birth at a designated facility under the Safe Haven Act. We disagree with Mother's narrow interpretation of the word "neglect."

15

Although the act of dropping the Twins off at a designated facility may not have caused them immediate harm, the child's health or welfare is nonetheless "placed at a substantial risk of harm[,]" because there is no parent or legal guardian who can make decisions on their behalf. *Id.* It is necessary for the Department to intercede on their behalf for their health and safety.

We agree with the Appellate Court's prior interpretation that "a finding of neglect may be based on a substantial risk of harm to the child if the Department of Social Services "does not take charge of the child." *In re B.Cd.*, 267 Md. App. at 88 (citing *Doe*, 205 Md. App. at 60). A "neglect" finding may be based upon the impact the parent's actions could have on the child if the local department does not take charge of the child. *Id.*; *see also Owens v. Prince George's County Dep't of Soc. Serv.*, 182 Md. App. 31, 54–55 (2008) (affirming a finding of neglect for refusing to permit a child to return to the home); *In re Nathaniel A.*, 160 Md. App. 581, 601 (2005) (finding neglect due to substantial risk of harm that the child would incur if not placed in foster care). The act of abandoning the child at the designated facility places the child at "substantial risk of harm[,]" CJP § 3-801(t)(1)(i), because without intervention by the local department, there is no one to provide for the child's basic health or welfare needs.

Applied to the uncontested facts of this case, the neglect definition is satisfied. By the time the Twins were ready for discharge from BWMC on September 17, 2024, there was no parent available, no legal custodian, no provision for their ongoing care, and no one legally obligated to feed, shelter, provide medical care for, or make decisions for them in the long-term. These children had been left without permanent provision for their care, placing them at substantial risk of harm. Every element of CJP § 3-801(t)(1) was satisfied.

16

That the Department intervened after the surrender does not alter the analysis. The focus is on whether the parent's conduct placed the child at substantial risk of harm, not on whether a third party subsequently ameliorated that risk. *See Doe*, 205 Md. App. at 61.

### E. The Safe Haven's Immunity From "Civil Liability" Does Not Prevent a Court From Making a Finding of Neglect in a CINA Proceeding Where the Parent Delivers a Newborn to a Designated Facility In Accordance With the Safe Haven Act.

We turn to Mother's contention that interpreting the definition of "neglect" under the CINA statute to support a finding of neglect under these circumstances is inconsistent with the provision of the Safe Haven Act that provides immunity from civil liability when an individual acts in accordance with the statute. The Safe Haven Act states:

> A person who leaves an unharmed newborn with a responsible adult or at a designated facility within 60 days after the birth of the newborn, as determined within a reasonable degree of medical certainty, and does not express an intent to return for the newborn shall be immune from civil liability or criminal prosecution for the act.

CJP § 5-641(b)(1). We start our statutory analysis by noting that the Act does not define the term "civil liability." Black's Law Dictionary defines "liability" as "[t]he quality, state, or condition of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment." *Liability*, BLACK'S LAW DICTIONARY (12th ed. 2024).

Mother interprets "civil liability" broadly to include a CINA neglect finding because of the potential adverse direct and collateral consequences of such a finding. The Department, on the other hand, takes a narrower approach, by suggesting that immunity from "civil liability" simply precludes legal action against the parent by a person on behalf of the newborn for the "act" of abandonment, which would not be precluded by the doctrine

17

of parent-child immunity. The dictionary definition supports both interpretations. We determine that the Act's language on immunity from "civil liability" is ambiguous.

### 1. *Legislative History*

To resolve this ambiguity, we turn to the legislative history. That history, however, reveals no reference to, or information about, the meaning of immunity from "civil liability." The Floor Report prepared by the Senate Judicial Proceedings Committee noted that the immunity from criminal prosecution included criminal penalties that arose from crimes for deserting a minor child or by engaging in an act that "willfully renders a child in need of assistance." Floor Report for House Bill 602, Safe Haven Act, 2002 Leg., 418th Sess. (Md. 2002). The Revised Fiscal Note for Senate Bill 3 contains an extensive discussion on the criminal laws in Maryland "related to desertion of a minor child." Revised Fiscal Note, Senate Bill 3, 2002 Leg., 416th Sess. (Md. 2002). Although the Floor Report for House Bill 602 and the Revised Fiscal Note for Senate Bill 3 contain an extensive discussion on the criminal laws in Maryland "related to desertion of a minor child," there is no discussion concerning what the General Assembly intended insofar as immunity from "civil liability."

Notwithstanding the lack of legislative history on the meaning of "civil liability," the legislative history reflects that an alternative to the CINA process was considered and rejected. As introduced, Senate Bill 3, the "Maryland Safe Haven Act," proposed making a parent's voluntary surrender of an unharmed newborn under the statute constitute the "relinquishment" of parental rights. S.B. 3. (2001) at 1. The bill also proposed to create a new subtitle in the Family Law Article that would have required the local departments to "[t]ake control and custody of the relinquished newborn within 24 hours" and "file a

18

petition to terminate the parental rights of the relinquished newborn in accordance with [former] § 5-313" of the Family Law Article, *repealed by* 2005 Md. Laws, ch. 464 (S.B. 710) § 2, and to vest judicial authority over the child with the guardianship court. S.B. 3 at 2-3. The bill would have barred the guardianship court from returning the child to a parent's custody absent a specific finding that the return would not present "an unacceptable risk to the future and safety of the child." *Id.* at 3.

While the Senate was considering Senate Bill 3, the House considered a different bill, H.B. 602—titled "Maryland Safe Haven Act of 2002"—with a more limited scope. H.B. 602 (2002). Instead of creating a new process for custody and guardianship proceedings for a newborn, the House Bill did not modify the existing CINA subtitle and limited its impact to providing immunity from certain potential criminal sanctions. *Id.* at 2.

After both chambers passed their respective bills, the General Assembly appointed a conference committee to reconcile them. On April 2, 2002, J. Theodore Wieseman, Counsel for the Office of the Public Defender, wrote a letter to Walter H. Baker, in which he advocated for the Senate to adopt the House Bill. Letter from J. Theodore Wieseman, Couns., Off. of the Pub. Def., to Walter H. Baker, Senator, Md. State Senate (Apr. 2, 2002). The letter explained that the "House Bill does not change existing CINA law as to the duties and responsibilities of all persons after the baby is delivered to a safe haven." *Id.* Mr. Wieseman further noted that after the legislature had spent "the last three years writing and rewriting the complex provisions of our CINA laws, there is no reason to do it again this time." *Id.*

19

On April 6, 2002, the Conference Committee reconciled the bills with an agreement that struck the proposed statutory text in both bills in favor of the text that was ultimately enacted as CJP § 5-641. 2002 Md. Laws, chs. 441–42. Consistent with Mr. Wieseman's letter, the enacted law did not modify any provision of the CINA statute. This legislative history reflects that the General Assembly considered whether to establish procedures outside the CINA statute to protect and manage the care and protection of a baby that was subject to the Safe Haven Act and rejected that approach.

### 2. *Subsequently Enacted Regulations*

The Safe Haven Act directs the Secretary of Human Resources to "adopt regulations to implement the provisions of this section." CJP § 5-641(f). The Secretary adopted regulations for the Safe Haven Act in 2003. COMAR 07.02.27.01-03.

The purpose of the Act "is to provide the mother of a newborn the opportunity to provide a safe abandonment of her newborn" and to "[p]rovide for a long-term plan of care of the abandoned newborn." COMAR 07.02.27.01(A), (B)(4). The regulations set forth the duties of the local department of social services upon being notified that a hospital or other designated facility has accepted a newborn. COMAR 07.02.27.03D-H; CJP § 5-641(c)(2). The local department must "take responsibility of the newborn when medically ready for discharge under an [order for shelter care]." COMAR 07.02.27.03D. The local department shall then file a CINA petition "on behalf of the abandoned newborn in . . . conjunction with the request for an [order of shelter care]." COMAR 07.02.27.03E. If the mother, father, or relative of the newborn comes forward, and requests that the newborn be placed in the individual's care, a Child Protective Services investigation shall be initiated, during which the child shall remain in the care of the local department under

20

an order of shelter care "with a CINA finding and commitment to the [local department of social services]." COMAR 07.02.27.03F, G. All of the above regulations have remained in effect and unchanged since 2003.

It is clear from a review of the above regulations that the Secretary interpreted the Safe Haven Act to require the local department of social services to assume the care and custody of a newborn, when medically ready for discharge, under the provisions of the CINA statute, including seeking shelter care for an alleged CINA under CJP § 3-815, filing a CINA petition under CJP § 3-809, and pursuing a CINA finding under CJP § 3-801(f). The Secretary's 2003 regulations require local departments to file CINA neglect petitions following Safe Haven surrenders. *See* COMAR 07.02.27.03(C). The regulations adopted by the Secretary under the Safe Haven Act constitute "a long-continued and unvarying construction applied by administrative officials" and are "strong persuasive influence in determining the judicial construction of the statute[.]" *Higinbothom*, 187 Md. at 133. "[L]ong-standing legislative acquiescence gives rise to a strong presumption that the interpretation is correct." *Sinai Hosp. of Balt., Inc. v. Dep't of Emp. & Training*, 309 Md. 28, 46 (1987); *Macke Co. v. Comptroller of the Treasury*, 302 Md. 18, 22 (1984). The General Assembly has left those regulations undisturbed for more than twenty years. We find no reason to disturb that interpretation now.

### 3. *Additional Evidence of Legislative Intent—Related Statutes*

We find additional support for an interpretation of the Safe Haven Act's immunity from civil liability as not extending to a finding of "neglect" under the CINA statute in a related statute: the guardianship provisions set forth in Subtitle 3 of Title 5 of the Family

Law Article. It is instructive to discuss the statutory history related to the guardianship statute.

As both parties acknowledged in their briefs, at the time of the Safe Haven Act's enactment, a guardianship statute permitted a court to grant the Department guardianship, with the right to consent to adoption, of an "abandoned" child. *See* FL § 5-313(a)(1) & (b) (2002). To do so, the court had to find that "[t]he identity of the child's natural parents is unknown" and that "[n]o one has claimed to be the child's natural parent within 2 months of the alleged abandonment of the child." FL § 5-313(b)(1) & (2) (2002). The guardianship subtitle also permitted a court to grant guardianship of a child to the Department if the child's parent consented. FL § 5-317(c) (2002). This meant that the Department could obtain guardianship of a Safe Haven child without a court needing to find that the parent "neglected" the child under the CINA statute.

In 2005, the General Assembly overhauled the guardianship subtitle. 2005 Md. Laws, Ch. 464. Notably, the 2005 overhaul repealed provisions in former FL § 5-313 that permitted guardianship petitions of abandoned children, but reenacted those provisions, with amendments, at FL § 5-323(c). *See* Committee Note, 2005 Md. Laws, Ch. 464, at 2625 (noting that new subsection § 5-323(c) was "derived from" former § 5-313(b)).

The 2005 overhaul retained the existing provisions that permitted a court to order guardianship to the local department without providing specific grounds of unfitness if "the identities of the child's parents are unknown" and "no one has claimed to be the child's parent" within a specified 60-day period. 2005 Md. Laws, Ch. 464, at 2622 (codified as amended at FL § 5-323(c)). Significantly, the General Assembly expressly clarified that the 60-day period would *run from adjudication rather than abandonment.*" 2005 Md.

22

Laws, Ch. 464, at 2625 (emphasis added). The same Committee Note also explained that "*abandonment* as an alternative basis for nonconsensual [termination of parental rights] *is omitted* in light of the limited scope of this subtitle under new § 5-302." 2005 Md. Laws, Ch. 464 at 2627 (emphasis added).

As a result of the 2005 amendments, the statutory provision that authorized the Department to file a guardianship petition for a child who was "abandoned" was removed. Under the newly enacted guardianship statute, the Department could be granted guardianship under Subtitle 3 of Title 5 of the Family Law Article *only* for children already committed to it as CINA. FL § 5-302(a) (2005). Moreover, as reflected in the above-described Committee Notes, the General Assembly was aware that guardianship proceedings of an abandoned child could proceed only if the juvenile court had first adjudicated the child to be a CINA.

### 4. *Failed Attempts to Modify the Statute to Amend CJP § 3-801 to Create a CINA Finding for a Child Relinquished as a Newborn Without a Finding of Neglect*

Mother argues that the 2005 amendments to the guardianship statute that eliminated the ability for the Department to seek a guardianship of an "abandoned" child led to confusion about how to handle Safe Haven cases. To illustrate her point, Mother directs us to legislation that was proposed in 2019. That year, the Department proposed legislation—H.B. 167—that would have modified the language of CJP § 3-801 to permit the Department to assume guardianship of a child without a finding that the parents had neglected the child. H. B. 167, 2019 Leg., 415th Sess. (Md. 2019). It did this by proposing to add the phrase "has been relinquished as a Safe Haven newborn" as one of the ways that

23

a child can be found CINA. *Id.* Maryland's Legal Aid Bureau's written testimony in support of the proposed legislation stated:

> Currently, it is not clear that children relinquished in accordance with [CJP §] 5-641, otherwise known as "safe haven newborns" may be adjudicated as children in need of assistance (CINA). Without a finding that the safe haven newborn is a child in need of assistance there are no statutory procedures in place regarding how the Department of Social Services should move forward with a "safe haven newborn" once the child has been relinquished.

Testimony in Support of H.B. 167, H.B. 167, Judiciary Committee, 2019 Leg., 415th Sess. (Md. 2019). The General Assembly did not enact the bill into law. Although we do not treat the "amendment-rejection" theory as "a completely determinative method of ascertaining legislative intent," it "strengthens the conclusion that the Legislature did not intend to achieve the results that the amendment would have achieved, if adopted." *State v. Bell*, 351 Md. 709, 721 (1998) (citation modified); *Demory Bros.Inc. v. Bd. of Pub. Works*, 273 Md. 320, 326 (1974).

### 5. *The Consequences of Mother's Interpretation*

Finally, we note that "every . . . statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *FC-GEN Operations, Invs., LLC*, 482 Md. at 380 (citation modified). We must "consider the consequences of alternative interpretations of the statute, in order to avoid constructions that are illogical, . . . nonsensical, or that render a statute meaningless." *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 170 (2021) (citation modified). Here, the Department argues that it would be an absurd result to interpret the Safe Haven Act to render the local department and juvenile courts powerless to protect a newborn in a CINA proceeding. We agree.

24

As noted above, a juvenile court can find a child to be a CINA only upon a finding that the child "has been abused, has been neglected, has a developmental disability, or has a mental disorder[.]" CJP § 3-801(f)(1). For an unharmed newborn who is left with a responsible adult or at a designated facility under the Safe Haven Act, the child cannot be a CINA unless the juvenile court finds that the child "has been neglected." *See id.* If, as Mother argues, the language of the Safe Haven Act granting immunity from "civil liability" precludes a CINA neglect finding, a local department of social services would have no legal authority to provide the care, protection, safety, development, and placement or reunification required by the CINA Statute. *See id.* § 3-802(a).

To avoid the absurdity of a statutory interpretation that precludes a juvenile court from assuming jurisdiction of the newborn as a CINA, Mother argues that the local department can take custody of the newborn under the shelter care provision, CJP § 3-815(a), and then file a petition for guardianship leading to adoption, FL § 5-313. However, as discussed above, any path toward guardianship with the right to consent to adoption requires a prior judicial finding that the newborn is a CINA. *See* FL § 5-302(a)(1) ("This subtitle applies only to: (1) guardianship of an individual who is committed to a local department as a child in need of assistance[.]").

Next, Mother argues that the local department can assume guardianship of a newborn without a neglect finding by petitioning for guardianship of a minor under Section 13-702 of the Estates and Trusts Article ("ET"). We are unpersuaded. As the Department points out, the Estates and Trusts Article does not contain any procedures for emergency orders that would provide legal custody. Moreover, under ET § 13-702, only a "person interested in the welfare of the minor" is permitted to file a petition for appointment as a

25

"guardian" of a minor child, but the statutory definition of "person" excludes the local government and all other State agencies. Md. Code Ann. Gen. Prov. § 1-114 (2025); *see also Washington Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 622–23 (2010) (explaining that "[w]e have long recognized that . . . the term 'person' in a statute does not include the State and its agencies and instrumentalities" unless "such an intention is manifest" (citation modified)).

Finally, it is noteworthy that no reference to the Estates and Trust article is found within the legislative history of the enactment of the Safe Haven Act. We agree with the Department that it strains credulity that the General Assembly would have so substantially altered the statutory scheme to permit the local governments to determine which cases to pursue in private guardianship proceeding instead of the comprehensive CINA subtitle— the latter process being the one recognized by the Department in its implementing regulations for the past twenty years.

In conclusion, Mother's interpretation of the Safe Haven Act would lead to an absurd and illogical result. We agree with the Appellate Court that "[t]o preclude a CINA neglect finding would abrogate a regulatory system that was designed to implement the provisions of the Safe Haven Act," which "has been in operation for over twenty years, and [would] replace it with an unproven scheme that clearly does not provide the proper care and attention for an abandoned newborn." *In re B.Cd.*, 267 Md. App. at 101.

We are aware that our holding requires us to attach the label of "neglect" to an act the General Assembly has affirmatively encouraged and sought to protect. That cannot be helped. The label is what the statute requires, and it is what the agency implementing the statute has applied for twenty-two years. A parent who complies with the Safe Haven Act

faces a neglect finding—a finding that is necessary for the protective machinery of the State to operate.[3] The Dissent would avoid that label by reading the Safe Haven Act to foreclose a neglect finding for a parent who surrenders a newborn in compliance with the statute. We cannot accept that reading.[4] Treating a compliant surrender as neglect does not, however, erase the distinction between a lawful surrender and an unlawful abandonment. We observe that other states have addressed this problem directly by creating a distinct category for cases of abandonment. *See, e.g.*, N.Y. Fam. Ct. Act § 1012(f)(ii); D.C. Code Ann. § 4-1451.05(a), (b). The General Assembly has been aware of this gap at least since 2019, when H.B. 167 was introduced to add a Safe Haven surrender as an independent basis for CINA jurisdiction without a neglect finding. That bill did not pass, and the General Assembly has left the Department's regulatory practice undisturbed for more than two decades. If the General Assembly agrees with Mother that the Department should have an option to proceed without obtaining a neglect finding, it can

---

[3] Here, Mother did not present any evidence concretely establishing adverse direct or collateral consequences she suffered because of the CINA neglect finding. As such, we reserve for another day whether the Safe Haven statute's immunity against civil liability provides an abandoning parent with a defense against downstream adverse regulatory and legal consequences, if any, from a CINA neglect finding.

[4] The Dissent reads the Safe Haven Act to foreclose a neglect finding whenever a parent complies with the statute. That reading is difficult to square with the Dissent's own premise. The Dissent accepts that the Act "by its plain language does not bar . . . a neglect finding under the CINA subtitle . . . where the definition of neglect is satisfied," Dissenting Op. at 1, yet concludes that a compliant surrender can never satisfy that definition. For the reasons explained in Part III.D, a surrender that leaves a newborn with no legal custodian and no provision for care does satisfy CJP § 3-801(t)(1). The Dissent's reliance on emergency shelter care, Dissenting Op. at 4, does not fill the resulting gap, because shelter care is temporary and does not afford the Department with the legal authority to make long-term arrangements for the care of an abandoned newborn. CJP § 3-815(b)(1); Md. Rule 11-204(b)(2).

create a separate path along the lines of the legislation it considered, but did not adopt, in 2019. Unless and until it does, the current statutory framework requires affirmance.

## IV.

### Conclusion

In conclusion, we hold as follows:

*First*, a parent's surrender of a newborn pursuant to the Safe Haven Act may constitute neglect under CJP § 3-801(t)(1) where the uncontested facts establish that the surrendered child had no legal custodian and no provision for care upon hospital discharge, placing the child at substantial risk of harm. The neglect finding must rest on an individualized assessment of the child's actual condition—not a categorical legal inference from the fact of surrender. On the uncontested record before us, the neglect finding is supported.

*Second*, immunity from "civil liability" under the Safe Haven Act does not preclude a finding of "neglect" under the CINA statute. Accordingly, the juvenile court did not err by finding that Mother's actions constituted "neglect" under CJP § 3-801(t)(1).

We affirm the judgment of the Appellate Court of Maryland.

**THE JUDGMENT OF THE APPELLATE COURT OF MARYLAND IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

28

Circuit Court for Anne Arundel County
Case Nos. C-02-JV-24-000463 & C-02-JV-24-000464

Argued: March 6, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 47

September Term, 2025

_____

IN RE: B.CD. & B.CB.

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Concurring and Dissenting Opinion by Watts, J., which Eaves, J., joins.

_____

Filed: July 15, 2026

I concur in part and dissent in part from the Majority's opinion. I agree with the Majority's conclusion that the immunity provision of the Safe Haven Act, Md. Code Ann., Cts. & Jud. Proc. ("CJ") § 5-641, does not bar a neglect finding in a Child in Need of Assistance ("CINA") proceeding. See Maj. Slip Op. at 17, 28. In that respect, I concur in the judgment of the majority opinion. A CINA neglect finding does not constitute "civil liability" or a "criminal prosecution" from which the Safe Haven statute immunizes a parent. CJ § 5-641 protects the lawful act of surrender of a child from civil liability or criminal prosecution but by its plain language does not bar the State from pursuing, or a juvenile court from making, a neglect finding under the CINA subtitle, CJ §§ 3-801 to 3-837.1, where the statutory definition of neglect is satisfied.

I do not agree, however, that action by a parent in compliance with the Safe Haven statute alone constitutes neglect under CJ § 3-801, as the Majority holds. See Maj. Slip Op. at 15-17, 28. Although I do not read the Safe Haven statute to bar a juvenile court from making a neglect finding when the statutory elements of neglect are established, see CJ § 5-641(b)(1); CJ § 3-801(f), (t)(1), unlike the Majority, I do not agree with the Appellate Court's conclusion that, where a parent surrenders a child to a designated facility under the Safe Haven Act, "a finding of neglect may be based on a substantial risk of harm to the child if the Department of Social Services does not take charge of the child[,]" Maj. Slip Op. at 16 (citation modified).[1]

---

[1]At the outset, it must be pointed out that concluding that the Safe Haven Act does not bar a finding under the CINA subtitle that a child has been neglected—*i.e.*, a parent does not have immunity from a CINA proceeding resulting in a neglect finding—does not

I would not hold that a parent's conduct in complying with the provisions of the Safe Haven Act, by delivering a child to a statutorily designated facility and not returning, satisfies the definition of neglect under the CINA statute, CJ § 3-801(t)(1). See Maj. Slip Op. at 28. There are key aspects of the Majority's holding with which I disagree. First, in reaching the holding—that "a parent's surrender of a newborn pursuant to the Safe Haven Act may constitute neglect under CJP § 3-801(t)(1) where the uncontested facts establish that the surrendered child had no legal custodian and no provision for care upon hospital discharge, placing the child at substantial risk of harm[,]" Maj. Slip Op. at 28—the Majority engages in a faulty statutory construction analysis of CJ §§ 5-641 and 3-801. In addition, the Majority appears to divine legislative intent concerning a neglect finding under CJ § 3-801 from a misreading of Doe v. Allegany Cnty. Dep't of Soc. Servs., 205 Md. App. 47, 43 A.3d 1071 (2012).

Although the Safe Haven statute does not immunize a parent from a CINA neglect finding, a compliant Safe Haven surrender, including the anticipated non-return for discharge, is not by itself enough to satisfy the definition of neglect under CJ § 3-801. The Safe Haven statute does not foreclose a finding of neglect under CJ § 3-801, but more is required to establish neglect than a parent's compliance with the provisions of CJ § 5-641.

mean that the act of safely surrendering a child pursuant to the Safe Haven Act by itself is sufficient to satisfy the definition of neglect under CJ § 3-801(t). Although a neglect finding is not precluded where a child is surrendered under the Safe Haven Act, a finding of neglect is not an automatic outcome of a safe surrender in compliance with the Act. To the contrary, where there is evidence that a child who is surrendered pursuant under the Act "has been neglected" and the definition of neglect set forth in CJ § 3-801(t) has been satisfied, a neglect finding is not precluded.

- 2 -

CJ § 5-641(b)(1) provides that a person who leaves an unharmed newborn with a responsible adult or at a designated facility within 60 days after birth, and who does not express an intent to return, "shall be immune from civil liability or criminal prosecution for the act." The statute requires the involvement of a local department of social services after a child is surrendered[2] and does not indicate that a finding of neglect under CJ § 3-801 may not be made, where the elements of neglect under the CINA subtitle are satisfied. In my view, however, merely surrendering a child in compliance with the Act is not sufficient to constitute a finding of neglect.

Under the CINA subtitle, CJ § 3-801(f) defines a "child in need of assistance" as a child who requires court intervention because the child "has been abused" or "has been neglected" and the child's parents, guardian, or custodian is unable or unwilling to give proper care and attention to the child and the child's needs. CJ § 3-801(t)(1) defines "neglect" as "the leaving of a child unattended or other failure to give proper care and attention to a child" under circumstances indicating harm or a substantial risk of harm or that the child has suffered a mental injury or been placed at substantial risk of mental injury. A fair reading of the text of CJ §§ 5-641 and 3-801 demonstrates that a parent does not place a child at a substantial risk of harm simply by doing what Maryland's Safe Haven statute allows—delivering a child to a hospital without the intent to return.

---

[2]A designated facility that accepts a newborn must notify the local department of social services within 24 hours, and the Secretary of Human Services must adopt regulations to implement the statute. See CJ § 5-641(c)(2), (f).

- 3 -

As authorized under CJ § 5-641(f), the Secretary of Human Services has promulgated regulations to assist in implementing the statute. Although the Majority correctly states that the regulations "require local departments to file CINA neglect petitions following Safe Haven surrenders[,]" Maj. Slip Op. at 21, the regulations do not contemplate that the act of surrendering a child itself shall satisfy the definition of neglect under CJ § 3-801(t). The plain language of Code of Maryland Regulations ("COMAR") 07.02.27.03(D) provides that, once the newborn is medically ready for discharge, the Local Department of Social Service ("LDSS") "in the jurisdiction where the hospital is located shall take responsibility of the newborn" under an order for shelter care ("OSC"). The regulation requires the LDSS to file "a CINA petition . . . on behalf of the abandoned newborn . . . in conjunction with the request for an OSC." COMAR 07.02.27.03(E). And if a mother, father, or relative later comes forward seeking placement, "[a] Child Protective Services investigation shall be initiated" while "[t]he child [] remain[s] in the care of the LDSS under an OSC with a CINA finding and commitment to the LDSS pending the outcome of the investigation." COMAR 07.02.27.03(F), (G). The regulation authorizes the use of CINA proceedings in connection with a child surrendered under the Safe Haven Act, but, read properly, COMAR 07.02.27.03(G) contains a requirement that a child shall remain in the care of a local department under an order of shelter care, with a CINA finding and commitment to the local department pending the outcome of an investigation. The only mandatory or "per se" requirement imposed by the regulation is that a child shall remain in the care of the local department under an order of shelter care, which does not require a finding of neglect under CJ § 3-801(t)(1).

- 4 -

COMAR 07.02.27.03(C)-(G) do not mandate a finding of neglect as a disposition under CJ § 3-819 (the CINA statute governing disposition hearings). If that were the case, the language in COMAR 07.02.27.03(G) that the child shall remain in the care of a local department under an order of shelter care, *with a CINA finding and commitment pending the outcome of the investigation*, would be meaningless. Under the plain language of the regulation, a CINA finding and commitment depends upon the outcome of an investigation, not the circumstance that a hospital or other designated facility accepted the child under the Safe Haven Act and the parent did not return.

COMAR 07.02.27.03(C) through (G) reflect the Secretary's determination that a CINA proceeding is the mechanism to be used when a local department of social services assumes care of a newborn surrendered under the Safe Haven law, but nothing in the plain language of the regulation leads to the conclusion that a CINA finding of neglect is a per se or an automatic outcome of the surrender of a child under the Safe Haven Act where a parent appears at a disposition hearing and is unwilling or unable to provide care and attention to a child.

Where a parent is unwilling or unable to provide care for a child at a CINA disposition hearing, with or without having surrendered a child under the Safe Haven Act, a parent may be subject to a neglect finding under CJ § 3-801. Such a parent may be subject to a neglect finding because a parent who at a CINA disposition hearing is unwilling or unable to provide proper care and attention to a child generally acknowledges a circumstance—a failure to provide proper care and attention to a child—which in and of

itself is a circumstance indicating a substantial risk of harm to the child, warranting a finding of neglect under CJ § 3-801.

A parent does not necessarily place a child at a substantial risk of harm by leaving an unharmed newborn at a designated facility without expressing an intent to return, which is exactly what Maryland's Safe Haven statute authorizes. The statute expressly contemplates that the surrendering parent may leave the child and not come back. See CJ § 5-641(b)(1). The Majority's conclusion that the definition of neglect is satisfied because "there was no parent available, no legal custodian, no provision for [the twins'] ongoing care, and no one legally obligated to feed, shelter, provide medical care for, or make decisions for them in the long-term[,]" Maj. Slip Op. at 16, is at odds with the plain language and purpose of the Safe Haven statute and fails to satisfy the definition of neglect under CJ § 3-801.

The Majority's attempt to ground a finding of neglect under CJ § 3-80(t)(1) on a child who is surrendered under the Safe Haven statute having "no legal custodian" at the time of discharge— because as the Majority puts it, there was "no legal custodian" and "no one legally obligated to feed, shelter, provide medical care for, or make decisions for [the twins] in the long-term"—is contrary to the plain language of both CJ § 5-641(b)(1) and CJ § 3-801(t)(1). Maj. Slip Op. at 16. Under the Safe Haven statute's plain language, the parent's nonreturn is not a separate, unexpected act of abandonment; it is the very circumstance the Safe Haven statute anticipates and in fact requires—that the parent have no intent to return. See CJ § 5-641(b)(1). Under CJ § 3-801(t)(1), the CINA statute setting forth the definition of neglect, to establish neglect, a local department must prove that a

- 6 -

parent left a child unattended or that a parent failed to give proper care and attention to a child under circumstances that indicate "[t]hat the child's health or welfare is harmed or placed at substantial risk of harm[.]"  CJ § 3-801(t)(1)(i).

Under the principles of statutory construction, the Safe Haven statute and CJ § 3-801(t)(1) must be read together, not in a way that causes one statute to nullify the provisions of the other.  See, e.g., Andrews & Lawrence Pro. Servs., LLC v. Mills, 467 Md. 126, 149, 223 A.3d 947, 960 (2020) ("When the statute to be interpreted is part of a statutory scheme, it must be interpreted in that context. . . . [T]he statute as a whole must be construed, interpreting each provision . . . in the context of the entire statutory scheme.  Thus, statutes on the same subject are to be read together and harmonized to the extent possible, reading them so as to avoid rendering either of them, or any portion, meaningless, surplusage, superfluous or nugatory."  (Citation modified)); Lockshin v. Semsker, 412 Md. 257, 276, 987 A.2d 18, 29 (2010) ("We presume that the [General Assembly] intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope."  (Citations omitted)).

Yet, the Majority identifies a parent not retrieving a child from a designated facility, after a surrender under the Safe Haven statute, as a circumstance that may constitute a finding of neglect under the CINA statute because the child's health or welfare is placed at substantial risk of harm and "there is no parent or legal guardian who can make decisions on their behalf."  See Maj. Slip Op. at 16 (citation omitted).  The Majority identifies the alleged neglect as Mother dropping the twins off at a designated facility and not appearing

when the twins were medically ready for discharge because, according to the Majority, there may be a substantial risk of harm to the children if the Department did not take charge of the children. See Maj. Slip Op. at 16-17. But those circumstances do not satisfy the statutory definition of neglect under CJ § 3-801(t)(1)(i), which requires circumstances indicating that the child's health or welfare "is harmed or placed at substantial risk of harm." Despite what the Majority says, at discharge, the twins were not left unattended or without care. They remained well and cared for under the Safe Haven statutory process, which contemplates that responsibility for a surrendered child will pass to a local department of social services rather than back to the surrendering parent, who under the statute must have no intent to return.

The Majority's substantial risk conclusion rests on the false premise that the Department's involvement was akin to an independent rescue of the sort necessary to avert the harm of an abandoned child having no legal custodian and provision for ongoing care. See Maj. Slip Op. at 15-17. In the event of the surrender of a child under the Safe Haven statute, however, the child's transfer from hospital care to a local department of social services is the statutory mandate. Maryland law requires a designated facility that accepts an unharmed newborn to notify the local department within 24 hours, see CJ § 5-641(c)(2), and the implementing regulations require the local department to assume responsibility when the newborn is medically ready for discharge, see COMAR 07.02.27.03(D). The twins therefore were not left with "no one to provide for [their] basic health or welfare needs" at discharge. Maj. Slip Op. at 16.

Under the Safe Haven statute, a surrendered child has legally prescribed sources of care, first the hospital, then the local department.  The Majority's statement that the twins were left with "no legal custodian, no provision for their ongoing care, and no one legally obligated to feed, shelter, provide medical care for, or make decisions for them in the long-term[,]" Maj. Slip Op. at 16, treats the Department's involvement as an unexpected occurrence, when in fact it was the statutorily ordained legal consequence of compliance with the Safe Haven Act.  Because the intervention of a local department of social services is what the Safe Haven statute contemplates and requires, a parent's nonappearance at a child's discharge from a designated facility does not constitute a circumstance indicating that the child's health or welfare was harmed or placed at substantial risk of harm within the meaning of CJ § 3-801(t)(1)(i).  To hold otherwise is to convert the very process the General Assembly enacted for the safe, anonymous relinquishment of a newborn into the basis for an automatic neglect finding.

The Majority's use of the Appellate Court's holding in <u>Doe</u>, 205 Md. App. 47, 43 A.3d 1071, in its analysis of circumstances indicating a substantial risk of harm under CJ § 3-801(t)(1) in the context of the Safe Haven statute is flawed.  <u>See</u> Maj. Slip Op. at 16-17.  The Appellate Court's holding in <u>Doe</u> stemmed from a materially different factual and legal setting.  In <u>Doe</u>, 205 Md. App. at 58-59, 43 A.3d at 1078, the caregivers of a teenaged minor, M.C., had already engaged in conduct alleged to be neglectful before the intervention of a local department of social services.  The caregivers refused to permit the minor, M.C., to return home, even though he was under eighteen, had medical needs, and had nowhere else to go.  <u>See id.</u> at 58-59, 43 A.3d at 1078.  The Appellate Court held that

this refusal itself placed M.C. at a substantial risk of harm, and that the local department of social service's prompt assumption of custody did not negate that risk. See id. at 60-61, 43 A.3d at 1079. As such, the parent or caregiver in Doe could not defeat a neglect finding by asserting that, because the local department took over quickly, their conduct did not create a substantial risk of harm at the time they refused to provide care for M.C. and that no neglect occurred. See id. at 62, 43 A.3d at 1080.

To be sure, in Doe, id. at 61, 43 A.3d at 1079, the Appellate Court stated that "the fact that the local department took charge of M.C. after he was found to be a child in need of assistance cannot possibly relieve [the caregivers] of responsibility for neglect." In describing the risk of harm, however, the Appellate Court stated that "[t]he focus was the risk of harm to the child at the time the child was not allowed to return home. By not allowing the child to return home, the child . . . was legally placed at substantial risk of harm." Id. at 62, 43 A.3d at 1080 (footnote omitted). In Doe, id. at 58-59, 43 A.3d at 1078, the caregivers created the risk of harm by barring the child from returning home, without knowing where or how M.C. would receive care. The Appellate Court concluded that the caregivers in Doe barred M.C. from the home with no provision for care, thereby creating a risk of harm that resulted in a neglect finding. See id. at 60-61, 43 A.3d at 1079. By contrast, in a Safe Haven surrender, the parent does not leave a child to uncertainty, homelessness, or a lack of care. Instead, the parent delivers the child directly to a statutorily designated facility that is obligated and prepared to accept the child and provide immediate care with the understanding that the local department of social services will intervene.

That distinction matters. In <u>Doe</u>, <u>id.</u> at 60-61, 43 A.3d at 1079, the Appellate Court concluded that the State's intervention did not erase the caregivers' earlier misconduct. Under the Safe Haven statute, however, the surrender itself is an act contemplated by statute, and a designated facility's acceptance of a child ensures that there is no lack of care or risk of harm as defined by CJ § 3-801(t)(1). In <u>Doe</u>, 205 Md. App. at 61, 43 A.3d at 1079, the local department stepped in only after wrongful conduct of the caregivers had already created the asserted risk of harm that the Appellate Court determined to be neglect. Under the Safe Haven statute, the care provided by a designated facility and local department are built into the lawful surrender process from the outset. Unless there is evidence of earlier or existing neglect, before a parent surrenders a child in compliance with the Safe Have statute, the Appellate Court's holding in <u>Doe</u> is not applicable. The Majority has failed to establish any basis for concluding that surrendering a child under the statute, under circumstances in which care will be provided first by a designated facility and next by a local department of social services, is a circumstance that indicates that the child's health or welfare is harmed or placed at substantial risk of harm.

The Majority equates the act of surrendering a child to a designated facility in compliance with the Safe Haven statute with the act of abandoning a child. It appears that the Majority sees no distinction between a mother abandoning a child or safely surrendering a child to a designated facility under the Safe Haven statute because, according to the Majority, the mother is leaving the child without a legal custodian. <u>See</u> Maj. Slip Op. at 16 ("The act of abandoning the child at the designated facility places the child at 'substantial risk of harm[,]' CJP § 3-801(t)(1)(i), because without intervention by

- 11 -

the local department, there is no one to provide for the child's basic health or welfare needs." (Alteration in original)). But the Safe Haven statute was enacted precisely for a parent to safely leave a child in the care of others without the intent to return. In both situations, a mother relinquishes a child. The difference, however, is what happens to the child. In a Safe Haven surrender, the child is placed directly with people who can provide immediate protection and care, while in a non-Safe Haven abandonment, a child may be exposed to a risk of harm. So, the law has every reason to treat the situations differently. Otherwise, the Safe Haven statute would be meaningless; the General Assembly would have created a protected way to surrender a child, while at the same time treating the surrender no differently from an unsafe abandonment.[3]

The General Assembly enacted the Safe Haven statute on the premise that a parent may relinquish a child safely, anonymously, and without any expectation of returning, so that the child would be protected rather than endangered. It is difficult to conceive that the General Assembly would have created a statutory scheme under which a parent who took

---

[3]In fact, under the Majority's holding that the neglect finding rests on the circumstances that "there was no parent available, no legal custodian, no provision for [the twins'] ongoing care, and no one legally obligated to feed, shelter, provide medical care for, or make decisions for them in the long-term[,]" and that the twins "had been left without permanent provision for their care, placing them at substantial risk of harm[,]" Maj. Slip Op. at 16-17, a voluntary legally arranged adoption by a birth parent could result in a finding of neglect, if there were a time period during the process in which there was no legally identified custodian, e.g., the down time between a voluntary termination of parental rights and the finalization of the adoption. Moreover, the timeframe in which there is no legal custodian available in a Safe Haven surrender is extremely brief in that a local department of social services is required to immediately petition for a shelter care order for a child with limited guardianship granted to the department.

the authorized action would be deemed to place any surrendered child at a substantial risk of harm as required for a finding of neglect under CJ § 3-801.

In the event of a surrender under the Safe Haven statute, a determination of neglect should be made on a case-by-case basis. Using a Safe Haven designated facility and not returning, which is what is anticipated by the statute, should not automatically result in a finding that a parent has neglected a child. The Majority's holding that "a parent's surrender of a newborn pursuant to the Safe Haven Act may constitute neglect under CJP § 3-801(t)(1) where the uncontested facts establish that the surrendered child had no legal custodian and no provision for care upon hospital discharge, placing the child at substantial risk of harm[,]" Maj. Slip Op. at 28, amounts to an automatic finding of neglect under CJ § 3-801. Where a child is surrendered anonymously under the Safe Haven Act, as contemplated, the wording of the Majority's holding will almost always be satisfied. Holding that a parent's compliant Safe Haven surrender and not being available at the time that a child is discharged from a hospital places a child at substantial risk of harm and results in a neglect finding under CJ § 3-801(t)(1) will have a chilling effect on a parent's willingness to surrender a child pursuant to the Act and will inhibit a parent's ability to be reunited with a child after a surrender.

I understand the practical concern. If neglect is not established under the CINA statute, the question becomes how will a local department obtain the authority necessary to provide long-term care for a child? I do not think that the solution is to stretch a neglect finding to cover conduct that the Safe Haven statute was specifically meant to allow. That would involve the juvenile court making a neglect finding not because neglect actually

occurred, but because a local department needs some legal authority for limited guardianship, *e.g.*, the Majority states: "We are aware that our holding requires us to attach the label of 'neglect' to an act the General Assembly has affirmatively encouraged and sought to protect. That cannot be helped." Maj. Slip Op. at 26.

If, absent a neglect finding, the Safe Haven Act and provisions of the Courts and Judicial Proceedings Article concerning CINA proceedings result in a potential gap in care where a child is surrendered under the Act, this is a matter for the General Assembly to address rather than for this Court to do so by contorting the definition of the term "neglect" to include surrendering a child under the Act. The better course is clarification by the General Assembly, not judicially redefining protected conduct as neglect under the CINA statute. The Safe Haven statute could be amended to provide that, upon a compliant surrender under the Safe Haven Act, the juvenile court may place a child in a local department's custody and grant limited guardianship to the local department of social services, without the requirement of a neglect finding under CJ § 3-801. If the current statutory scheme does not clearly provide a local department with the ability to obtain guardianship of a child after a surrender without a finding of neglect, the gap should be addressed directly by the General Assembly rather than by the Majority treating conduct the statute was designed to permit as neglect.

A compliant Safe Haven surrender does not, by itself, under the plain language of CJ § 5-641 or CJ § 3-801 constitute neglect or serve as the automatic basis for a neglect finding. In the event that a parent surrenders a child under the Safe Haven Act, a finding of neglect under the CINA statute should rest on conduct that fits the definition of neglect

- 14 -

under CJ § 3-801(t)(1), such as evidence of abuse or neglect that occurred before or during the surrender of the child under the Act, a parent's continued absence and failure to participate in CINA adjudication and disposition proceedings, or other post-surrender conduct showing an actual unwillingness or inability to provide proper care at the time of such proceedings.

For all of the reasons set forth above, I would reverse the judgment of the Appellate Court.

Justice Eaves has authorized me to state that she joins in this opinion.